**AFFIRMED as MODIFIED and Opinion Filed February 29, 2024**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-21-01024-CR

**DRALON DURAN PATTERSON, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 5**
**Dallas County, Texas**
**Trial Court Cause No. F-1975183-L**

## MEMORANDUM OPINION

Before Justices Carlyle, Goldstein, and Kennedy
Opinion by Justice Goldstein

Dralon Duran Patterson appeals his aggravated sexual assault conviction. A jury convicted appellant and sentenced him to confinement for life. In three issues, appellant complains 1) the jury charge failed to include "mandatory legislative language;" 2) his right to an impartial jury was violated when the prosecutors struck every black person from the venire panel; and 3) he received ineffective assistance of counsel.[1] In a single cross-point, the State asks that the judgment be modified to

---

[1] While appellant's brief identifies three issues presented, the 60 pages of argument are parsed into six sections, with issue three, ineffective assistance of counsel, comprised of eleven discrete purported failures. We have endeavored to address the arguments under the appropriate issue presented.

reflect that appellant is required to register as a sex offender. As modified, we affirm the trial court's judgment.

## BACKGROUND[2]

In April 2019, appellant was charged by indictment with aggravated sexual assault. The indictment alleged that, on or about February 1, 2019, appellant intentionally and knowingly caused the contact of the complainant's female sexual organ with appellant's sexual organ without the consent of the complainant, and appellant "did then and there by acts and words threaten to cause and place said complainant in fear that death and serious bodily injury and kidnapping would be imminently inflicted" on complainant.

At trial in October 2021, the complainant, testifying under the pseudonym Alicia Holmes, stated she was twenty-nine years old at the time of trial. Holmes lived in an apartment in Uptown Dallas. On the "day and night leading into January 31st, 2019," Holmes worked at her office in Irving and got home around 6:30 p.m. Holmes changed into leggings and a t-shirt, worked out at the apartment complex gym, and went from the gym to her friend Kelly's apartment to help take down Kelly's Christmas tree. Between 11:15 and 11:30 p.m., Holmes returned to her apartment complex and pulled into the parking garage. Holmes had a clicker that

---

[2] The facts are based on the record, exhibits admitted during the trial, and testimony and evidence adduced during the trial. While we have set forth in great detail the facts of the case, we do so solely to provide the context for the procedural challenges, analysis of egregious harm and asserted ineffective assistance of counsel.

opened a gate to go down to the bottom floors, which were for residents only. Holmes "always parked on the very bottom floor" near the elevator, and she "drove immediately down there to park."

Holmes got out of her car and grabbed her winter coat and "a bunch of shirts and dresses that [she] was carrying on hangers." When she got up to the elevator, appellant walked down "the ramp you drive down to get to that level of the garage." Holmes had never seen appellant before, but she "exchanged a quick small talk" with appellant and kept walking. Holmes had almost reached the elevator when she felt a pull on the back of her jacket and turned to find appellant pointing a gun at her. Holmes offered appellant everything she had in her pockets and said he could take her car. Appellant told Holmes they were going back to her car and demanded her keys and her phone. Holmes did not feel that she could run away because appellant had his finger on the trigger of the gun. Holmes had taken gun safety courses, and she knew "You're supposed to have your finger out, and it's resting on the barrel of the gun" to avoid an accidental misfire.

Appellant put the gun against the middle of Holmes' back right against her spine and told her to walk to her car. Holmes was "pretty silent" until she got halfway to the car, and then she started asking appellant not to shoot her and asking him "What can I do?" Appellant kept telling Holmes to "shut up." When they reached the car, appellant told Holmes to open the back driver's side door, turn around, and sit on the backseat. Holmes asked if she could put down the clothes she

was carrying. Appellant said she could "and to not do anything stupid." Holmes put all her things in the back seat, pushed them toward the passenger side, and sat down. Appellant told Holmes to take off her leggings. As she complied, she kept saying "Please don't shoot me. I'm not going to do anything stupid." Appellant kept telling Holmes to "shut up and stop talking." Appellant told Holmes she was "taking too long," so he started to pull her leggings down. When Holmes was taking her leggings off, appellant had the gun pointed at her face, and when he "reached over," appellant "had the gun at his side and he had his other hand pushing" the leggings down. Holmes' "only thought" was to "not panic and to humanize [herself]," which she did by saying "We don't need to do this. I'm not going to do anything stupid." Holmes kept her voice "really low so that it wouldn't come across as aggressive," and appellant started lowering his voice so they were "both talking to each other very calmly."

After her leggings were removed, appellant told Holmes to lie down on her back. Holmes was still wearing her underwear, and "there were a bunch of the hangers, like, poking." Holmes thought she "was going to die," and appellant moved her underwear to the side and placed his mouth on her vagina for approximately fifteen seconds. Holmes was crying and shaking her head and said "Please don't shoot me. We don't need to do this." Appellant said, "I'm not going to hurt you, but shut up," and then he pulled her underwear down. Appellant penetrated Holmes' vagina with his penis while she was on her back "[v]ery briefly" and "then it wasn't

–4–

really working." Appellant told Holmes to turn over, and she turned and lay on her stomach with her hips on the edge of the seat and her legs "still sitting outside the car." Holmes could feel her "toes on the parking garage floor." Appellant's penis penetrated Holmes' vagina from behind, and she "closed [her] eyes and just tried to count and breathe." Holmes testified the assault lasted between fifteen to thirty seconds. Appellant "was having issues staying fully erect," so "he pulled out of [Holmes] from behind and told [her] to turn around." Every time he told Holmes to do something, he told her "not to do anything stupid and to be quiet."

Holmes turned around and she could see the gun that was now in his pocket. Holmes could also clearly see appellant's face, and she later identified him in court. Appellant made Holmes put her mouth on his penis, and he eventually told her to stick out her tongue and ejaculated on her tongue. During the course of this assault, appellant told Holmes to "get on [her] knees in front of him." Appellant told Holmes to "spit it out," and she spit to her left-hand side "right in front of the tire for the backseat." Holmes looked up at appellant and asked if she could stand up because the gravel of the parking garage floor was digging into her knees. Appellant said she could. Holmes stood looking at appellant, who still had his hand on the gun in his pocket with his finger on the trigger. Holmes asked if she could put her leggings back on, and appellant said she could. Holmes put her underwear and leggings back on, and appellant said he was going to put Holmes' keys and phone at the elevator "where we first met."

Before appellant walked away, Holmes asked, "What do you need from me?" because she "wanted to keep as much control as [she] could." Appellant replied, "nothing with [Holmes'] name on it," so Holmes reached in her pocket, pulled out a twenty-dollar bill, and gave it to appellant. Appellant walked around the trunk of Holmes' car towards the elevator, and Holmes saw appellant had "been progressively pulling the gun out of his pocket" and had his finger on the trigger. Holmes "wanted to make sure [appellant] felt in control so that it didn't get more violent than it already was," so she told appellant "You don't need to hurt me. Thank you for being gentle. I'm not going to do anything stupid." Appellant stopped walking, turned around, and said "You're welcome." Appellant continued to walk to the elevator where he stacked Holmes' keys and phone. Appellant glanced back at Holmes and then sprinted back up the ramp.

Holmes immediately lay down on the floorboard of her car because she "was scared that [appellant] was going to turn around and shoot [her]." Holmes looked up through her windshield and saw appellant's "feet run up" the ramp and heard the echo of his feet on the floor above. Holmes waited until she could "hear it on the other side from where I was" before she got out of her car and ran to the elevator to get her phone and her keys. Holmes called the elevator, got in, and called 911.

Holmes gave the 911 operator her name and said that she had just been raped in her parking garage and "that he was running and he was still in the building, in the vicinity, and that [she] needed somebody." Holmes stayed on the phone with the

911 operator while she rode the elevator to her floor, ran down the hallway to her apartment, locked her door behind her, and went to her bathroom. Holmes testified she went to her bathroom because she was "shaking really bad and sobbing on the phone to 911, and [she] thought [she] was going to throw up." A recording of Holmes' call to 911 was admitted into evidence.

When the police officers arrived "about 15 minutes" later, Holmes let them in and told them what happened and also told them she had not drunk any water or changed clothes. More officers arrived and asked for the location of Holmes' car. The officers escorted Holmes back down to the elevator and to the first floor of the garage where an ambulance was waiting to take Holmes to Parkland hospital. Holmes had been texting Kelly to tell her what happened, and Kelly arrived and rode with Holmes in the ambulance. Holmes arrived at Parkland "after midnight" and was not examined until "around four a.m."

Dallas police officer Guillermo Rivas testified he and his partner were dispatched to Holmes' apartment a "little bit after midnight" on the night of the offense. When Rivas arrived, Holmes was "very frantic and emotional" and she was crying, but she was also "very cooperative, trying to tell us everything that she could remember." Rivas' body-cam footage of his interaction with Holmes was entered into evidence over appellant's hearsay objection. Rivas followed the ambulance to Parkland and was in the room with Holmes at the hospital, but he did not "stay the whole time with her."

Zegita Kelley, a sex assault examination nurse at Parkland, testified she examined Holmes on February 1, 2019. Among other things, Kelley observed redness on Holmes' knees and "a little scabbing on her kneecaps." The medical record of the examination, State's Exhibit 42, was entered into evidence without objection. Based on Holmes' description of the assault, Kelley swabbed Holmes' vagina and mouth and collected blood and urine samples. Kelley also performed a "pubic monswipe," a "collection of the inner thigh," and a collection from Holmes' mouth. After completing the exam, Kelley sealed everything up and put it in a drop box from which it was forwarded to the Southwest Institute of Forensic Sciences (SWIFS) for analysis. Because appellant did not use protection, Kelley offered medications for gonorrhea and chlamydia and prophylactics for HIV. Kelley testified this type of medication causes nausea, vomiting, and diarrhea, and the HIV prophylactic causes nausea, stomach pain, and diarrhea for thirty days and could affect "your kidney and liver."

Allan Holmes, a sexual assault detective with the Dallas police department, was assigned to the case, and he "read the report" and "downloaded all the body camera footage from the officers that night." Detective Holmes then "went out canvassing for video surveillance footage" and obtained footage from inside the parking garage where the offense occurred. The video camera on the entrance and exit gate showed a black Pathfinder exiting the parking garage shortly after the time

that the offense occurred. Detective Holmes released a description of the suspect to make the community aware that a violent offense had occurred in the area.

On the night of February 1, 2019, Leena Saadeh was on her way to meet friends at an apartment in Uptown. When Saadeh arrived in the area, she parked on the street, and a man approached and knocked on her window. The man was "a little bit taller" than Saadeh, it "appeared that he was black," and he had "baggy-looking clothes on." The man asked Saadeh "where Club Bay was," and Saadeh said "There's no such thing as Club Bay." Saadeh did not lower her car window during the exchange. The man knocked on the window again and asked the same question, and Saadeh again told him "There is no Club Bay." Saadeh's friend had texted her and said Saadeh should "meet her at the gate." Saadeh got out of her car, and the man followed her, continuing to ask "where this club was and what [she] was doing that night." As Saadeh approached the gate, the man "left [Saadeh] alone" and "walked away."

When Saadeh told her friend what happened, she was made aware that a sexual assault had occurred the night before, and "the description of that person" matched the description of the man she had just encountered. Saadeh and her friend "confirmed it with her roommate," who "pulled up the article." Saadeh read the description and said, "That's the guy that was just bothering me." Saadeh called 911 and waited on a balcony with her friends for the police to arrive. As the police "were approaching the street," the "guy who approached [Saadeh] at [her] car" came back

onto the street, and Saadeh yelled, "that's the guy." The police stopped their cars, "hopped out," and "chase[d] after the guy." After the police arrested the man, they again questioned Saadeh, and she "ended up going back upstairs."

Dallas police officer Lyndsei Bird was patrolling the Uptown area on the night of February 1, 2019, when she received a call about a sighting of the sexual assault suspect. Bird pulled onto the "street that was listed" and heard "a female voice yelling down to [her] 'that's him.'" When Bird looked over to "where she was yelling," she saw a suspect matching the description. Bird got out of her marked squad car and attempted to detain the suspect, but he "took off running." During the short foot chase that followed, another officer stepped in, the suspect "got on the ground," and the officers placed him in handcuffs and arrested him for evading arrest. When Bird got the suspect off the ground, she noticed that he had urinated on himself. Officers placed the suspect in Bird's car, and she transported him to police headquarters to be interviewed.

Dallas police officer Jared Maddox remained at the scene of the arrest to look for evidence after the suspect was transported. Maddox found a "two-toned handgun" that matched the description of the handgun used in the sexual assault. The handgun was located underneath a car, and Maddox knew it was in close proximity to where the suspect was arrested because the suspect had "urinated on the street right there," and the suspect vehicle was also located nearby.

On February 2, 2019, Detective Holmes used a photo of the suspect taken by a crime scene officer to compile a photographic lineup, and the complainant identified appellant. Following Holmes' identification of appellant, Detective Holmes obtained an arrest warrant for appellant as well as a search warrant to obtain a sample of appellant's DNA. When Detective Holmes attempted to execute the search warrant and obtain a buccal swab from appellant, appellant was "not interested in providing his DNA." However, Detective Holmes eventually succeeded in obtaining appellant's DNA "essentially" by force. After the sample was taken, appellant said "you are going to transplant my DNA. It's not going to match." Detective Holmes put the buccal swab in a sealed envelope and took it to SWIFS.

Detective Holmes interviewed the complainant and, based on her statement that a gun was present during the sexual assault, Detective Holmes believed the assault was not consensual. Detective Holmes had "not seen it, in [his] seven years of working as a Sex Assault Unit detective, where a gun was involved and it was consensual."

Dallas police officer Michael Gonzalez subsequently took photographs of appellant's Pathfinder and recovered a grey hoodie and grey sweatpants from the vehicle. Courtney Ferreira, a forensic biologist employed at SWIFS, tested the swabs taken from Holmes. Ferreira determined that a vaginal swab from Holmes showed that appellant was included as a contributor to the sample, and the "Random

Match Probability," or the probability that a randomly-selected person from the population could have contributed to the sample, was one in 1.51 million. The "sperm-cell fraction" of another sample included appellant as a potential contributor, and the "most conservative statistic for that was less than one in ten trillion." In other words, "[y]ou would need the population of about a thousand earths, and you would expect to find that DNA profile one time." Ferreira determined that both appellant and Holmes were included as potential contributors to a sample obtained from the trigger of the gun used in the assault. Ferreira testified it was possible that appellant transferred Holmes' DNA to the trigger after touching Holmes and then touching the trigger.

After the State rested, the trial court held a hearing outside the presence of the jury at which appellant was questioned by his attorney about his intent to testify in his own defense. Appellant confirmed that his attorney spoke with him about his Fifth Amendment right not to testify, and the decision whether to testify was appellant's alone. Appellant also confirmed that he understood the jury would judge his credibility if he testified, and the State would have the opportunity to cross examine him. Appellant testified he had decided he wanted to waive his Fifth Amendment right and testify on his own behalf.

With the jury present, appellant testified he studied business administration at Texas A&M Commerce and graduated cum laude. Appellant worked at Dallas County Elections for five years and was working at Experian as a fraud investigation

–12–

agent just before he was arrested. Appellant had a wife and two sons, and his wife was present throughout the trial.

Appellant testified to the following version of events on the night of the assault: appellant "chose to leave home that day" at "10:30, 11:30" and went to Deep Ellum. Appellant had "just gotten done getting [his] hair braided from [his] mother," so he could not "really state the exact time." After appellant arrived in Deep Ellum, as he was trying to park, three men and a woman came up to him "mistaking [his] car for a LYFT ride." Although appellant was not working for LYFT at the time, the men and the woman said, "we want to ride with you" and offered appellant $20 to drive them to a parking garage. Appellant agreed to take them to the parking garage, and they gave appellant directions to an "underground gate area" where one of the men "hit the garage key and opened up the gate." Appellant drove into the parking garage and went down until one of the men told him to "stop by a white car and by the elevator." Appellant's passengers told him to wait for them "because they were going to go bar hopping," and they "just needed to run up and get something." The passengers got out of appellant's car and "disappeared."

While appellant waited for the passengers to return, he parked "somewhere in the parking garage, away from all the other cars." As appellant was "parking backwards," he noticed "some of [his] stuff was stolen in [his] backseat." Appellant got out of his car and looked around "to make sure if it was missing," and he went to the elevator and pressed the button, but it was not working.

–13–

While appellant was standing by the elevator, a woman approached him. The woman was "very aggressive, very flirtatious," and she "immediately started making sexual gestures, advances." Appellant identified the woman as Holmes, and he testified Holmes "offered sex for rent money" and said "she always fantasized about being with a black man." Appellant was "just talking, being a friendly person," but he said he did not have Holmes' rent money. Holmes said, "All my boyfriends pay my rent," the two kept talking, and Holmes "eventually asked to see [appellant's] penis." Appellant showed his penis to Holmes, and she said, "Oh my God. I want you to fuck me." Holmes "grabbed [appellant] by [his] penis" and took him to her car twenty feet away, opened the back door, and took off "her left boot with the fur" and "started undressing her left leg." Appellant noticed that Holmes had on "black tights, boots with the fur, no socks," and "a scarlet red thong." Although appellant was "fully erect," he "kind of paused" because he did not have a condom. Appellant told Holmes he did not have a condom, but "she said she didn't care," so appellant "proceeded to penetrate her" for "about ten minutes" before "getting turned off." Appellant "come [sic] to [his] senses," and "just basically stopped." Appellant asked Holmes for her number, but Holmes said "no, her family wouldn't allow her to be with a black man." The encounter ended when Holmes said "Thank you for fulfilling my fantasy," and appellant said "Okay." Appellant forgot where he parked and "walked the wrong way" before walking "the other way" and walking past Holmes' car again. Holmes had "disappeared," and appellant realized the people he dropped

off were not going to "come back with [his] stuff." Appellant found his truck and "drove off and [went] home for the night."

The next day, appellant went to Uptown to go to British Beverage Company and "other bars around the area" and did not realize he "parked right across the street from that parking garage." A woman appellant identified as Saadeh was trying to parallel park, and she jumped out of her car and asked appellant if she was close enough to the curb. Appellant said she was "five feet away," Saadeh asked appellant to help her, and appellant directed her "how to parallel park basically." Saadeh got out of the car and "walked along the way" with appellant, but appellant did not know where she went. Appellant realized he had forgotten his wallet in his car.

As he was walking back to his car, "about 15 policemen" with "guns pointed" jumped out in front of appellant and told him to "get your black ass on the ground." Police officers handcuffed appellant, patted him down, and asked if he had any weapons. Appellant, who only had his phone and his keys on him, said "No" and asked if he was being arrested. The officers said he was being arrested for evading arrest. Appellant testified he did not have a weapon on the night of "his encounter with Ms. Holmes" or on the night he was arrested.

On cross examination, appellant confirmed that, on the night of the assault, "someone approached [him] and said that they needed a ride." Appellant testified he was not working for LYFT, but he had a "LYFT glow light" that did not have a "turn-off or turn-on switch" on his dashboard. Appellant denied that the officer that

initially encountered him on the night of his arrest was "a black female." When asked if it was "unlucky" that "just feet away from where you were arrested, a gun was recovered that had your DNA and this woman that's claiming rape, on the trigger of that gun," appellant responded, "Yeah. Being set up, yeah." In response to further questioning, appellant testified it was "The police" setting him up. Following appellant's testimony, the defense rested its case.

The State called Holmes as a rebuttal witness. Holmes testified she did not approach appellant and ask for sex, she did not ask to have sex with him for rent money, she had never been a prostitute, she had worked as a financial analyst since college, and she had always paid her own rent since graduating from college. The prosecutor called Holmes' attention to a photograph of Holmes taken on the night of the assault showing Holmes wearing tennis shoes and asked if Holmes had "boots with fur." Holmes testified she did not. After the State rested its case, the jury found appellant guilty of aggravated sexual assault.

At punishment, the trial court conducted a hearing outside the presence of the jury at which appellant's counsel made a "Crawford[3] confrontation clause objection" regarding two SANE nurses who were going to testify "about some hearsay statements from some other alleged victims of aggravated sexual assault, with the

---

[3] In *Crawford v. Washington*, 541 U.S. 36 (2004), the court held that the out-of-court statements by witnesses that are testimonial in nature are barred, under the Confrontation Clause, unless the witnesses are available at trial, or if unavailable, the defendants had a prior opportunity to cross-examine the witnesses, and irrespective of whether such statements are deemed reliable by the court.

–16–

alleged aggravated sexual assault victims not to be showing up for trial." The prosecutor first asserted that "it's a hearsay objection" and argued the statements to the SANE nurses were hearsay exceptions because they were made pursuant to receiving medical treatment and were also business records. As to the "Crawford issue," the prosecutor argued as follows:

> We also believe that it overcomes a confrontation issue, a Crawford issue, because the cases hold, and it's clear throughout, that statements made to the SANE nurses are non-testimonial. They're made by victims of crimes, victims of sexual assault, in order to seek and achieve medical treatment. At the time they are made, when they are made, they are not made with an eye towards future prosecution. They are not made to law enforcement officials. They're made to receive care. And they are made -- and, therefore, Your Honor, according to case law, they are non-testimonial statements. So the confrontation issue is overcome, based on that theory.

In response, appellant's counsel asserted the State was planning "on using these SANE nurses as testimonial witnesses," and "it's also highly prejudicial, because we cannot cross examine the alleged witnesses who made these statements, who won't even show up for court." Counsel asked the court to exclude the statements of both SANE nurses "based on the fact of the confrontation clause, based on the fact that it's highly prejudicial and based on the fact that we believe they are using these statements now as testimonial."

The prosecutor responded that "the pivotal question" was that "when these statements were made, when the SANE examine report was taken, when the nurse was receiving these statements, they were non-testimonial at that time." The prosecutor argued that the caselaw is "clear that these statements are non-

–17–

testimonial," so "Crawford is overcome and, for multiple reasons, hearsay is overcome as well." Defense counsel stated he did not want to "keep pinging back and forth," but he asserted the State was "trying to put on two additional aggravated sexual assaults without a victim." Counsel complained the evidence was so "highly prejudicial" that "it makes it hopeless for us to even have a chance in this case." Finally, the prosecutor noted that the "theory in this case is there was consent," and "the fact that [appellant] has been arrested and charged with additional sex assaults [under] very similar circumstances" was "highly probative" in addition to being prejudicial. The trial court overruled appellant's objection.

With the jury present, before any witnesses were called to testify, the prosecutor addressed the jury and stated that Detective Holmes was going to "talk about that this was not the first incident that [appellant] was tied to." In addition, the jury was "to hear from two additional sex assault nurses, who took two additional reports, collected evidence and that evidence came back to" appellant. The prosecutor also stated he wanted to be "up front and honest" about the fact that the jury was not going to "hear from those victims."

In response, appellant's counsel reiterated that the jury would not hear from "these two alleged victims that they're going to bring forth through the SANE nurse" and all a SANE nurse does is "take in that information" and document it without being able to "tell you the truth or the validity of any claims that are made."

Detective Holmes then testified that appellant's DNA profile was entered into a database that "constantly looks to match cases to one another and/or suspects to cases" and appellant was linked to two additional sex assault cases from February 2019 and November 2017. Detective Holmes testified they had "reports of highly-intoxicated women that were picked up at point A, dropped off at point B" and "didn't have a whole lot of memory" but thought they were "in a Uber" or "in a LYFT" and described the vehicle as a "dark-colored SUV." When Detective Holmes saw the video of a dark-colored SUV leaving the apartment complex, he thought "this is the person we've been hearing about or looking for."

Kristen Stansbury testified she was currently working as a nurse practitioner and had previously worked as a registered nurse in an emergency room and did sexual assault nursing as well. In November 2017, Stansbury conducted a sexual assault examination on a twenty-six-year-old woman who reported she was "grabbed by an unknown male" and thrown into his SUV" in a parking garage after leaving a wine bar in Dallas. The woman was struck in the face, raped, and driven to a parking lot near her home in Allen where she was left and walked home.

Amanda Webb, a forensic biologist at SWIFS, testified she analyzed the samples taken in November 2017 and determined that appellant was a "one in 10 trillion [contributor] in her vaginal swabs." Webb testified this result meant that "you would expect to have more than 10 trillion people before you would expect another person to match that DNA profile in the same way" that appellant did.

–19–

Lucrecia Delawter testified she was a sexual assault examination nurse working in January 2019 with a patient who reported "a mask [sic] man with a gun entered her home told her to get naked and sexually assaulted her penetrating her vaginal and anal opening." The patient further reported she "was in shock and in a daze during the entire episode" and did not "remember a lot of detail." Delawter collected samples from the patient "anywhere where she had told [Delawter] that the sex assault had occurred on her body."

The State again called Webb, who testified she tested the samples collected from the patient in January 2019. A sample from the patient's underwear included appellant as a contributor to the sample in a "less than one in 10 trillion statistic." At the conclusion of the punishment stage, the jury returned a verdict sentencing appellant to life imprisonment. Appellant filed a motion for new trial which was denied following a hearing.[4] This appeal followed.

## DISCUSSION

### A. Issue One: Jury Charge Error

In his first issue, appellant complains that the absence of mandatory legislative language in the jury charge constituted reversible error. Specifically, appellant argues the jury charge at punishment failed to properly instruct the jury with respect to parole pursuant to article 37.07 of the code of criminal procedure. This failure,

---

[4] The evidence and arguments presented at the hearing on appellant's motion for new trial will be discussed in connection with our consideration of appellant's claims of ineffective assistance raised in his third issue.

appellant contends, led the jury to improperly consider how parole law would affect the length of his sentence and resulted in a life sentence imposed based on this improper consideration.

### 1. Standard of Review

All alleged jury-charge error must be considered on appellate review regardless of whether it was preserved in the trial court. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). The standard of review for jury-charge error depends on whether the error was preserved. *Jordan v. State*, 593 S.W.3d 340, 346 (Tex. Crim. App. 2020) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985), *superseded on other grounds by rule as stated in Rodriguez v. State*, 758 S.W.2d 787 (Tex. Crim. App. 1988)). If error was preserved with a timely objection, then such error is reversible if it caused "some harm." *Id.* When there is jury-charge error but the defendant fails to object, as is the case here, we must determine whether the error caused the defendant "egregious harm." *Id.*

Errors that result in egregious harm are those that affect the very basis of the case, deprive the defendant of a valuable right, or vitally affect a defensive theory. *Gonzalez v. State*, 610 S.W.3d 22, 27 (Tex. Crim. App. 2020) (citing *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005)); *see also Chambers v. State*, 580 S.W.3d 149, 154 (Tex. Crim. App. 2019) (stating that egregious harm occurs when the error "created such harm that the appellant was deprived of a fair and impartial trial"). Under both the some harm and egregious harm standards, the appellant must

have suffered some actual—rather than merely theoretical—harm. *Gonzalez*, 610 S.W.3d at 27. In determining whether there was egregious harm, we ordinarily evaluate the entire record in light of *Almanza*'s four factors (the entirety of the charge, the state of the evidence, the arguments to the jury, and any other relevant information). *French v. State*, 563 S.W.3d 228, 237 (Tex. Crim. App. 2018). In some instances, however, a single consideration may persuade us that the risk of harm is so minimal that it precludes a finding of egregious harm. *See id.* at 239 (where risk of harm is so small that it "may properly be characterized as not 'remotely significant' ... any harm resulting from the error is only theoretical harm").

While the jury is the exclusive judge of the facts, it is bound to receive the law from the court and to be governed by such law. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994); *see also* TEX. CODE CRIM. PROC. ANN. art. 36.13. It is the court's function to provide the jury with an accurate statement of the law. *Abdnor*, 871 S.W.2d at 731; *Williams v. State*, 547 S.W.2d 18, 20 (Tex. Crim. App. 1977). The purpose of the jury charge is to inform the jury of the applicable law and guide them in its application to the case; it is not the function of the charge merely to avoid misleading or confusing the jury: it is the function of the charge to lead and prevent confusion. *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007).

## 2. Jury Charge: Punishment Phase: Parole

Article 37.07 section 4 of the code of criminal procedure sets out the manner in which the trial court shall charge the jury at punishment, depending on the offense

of which the jury has found the defendant guilty. *See* TEX. CODE CRIM. PROC. ANN. art 37.07 § 4. Without explanation, Appellant asserts that article 37.07 § 4(b) of the code of criminal procedure "undisputedly" applies in this case. *See id.* § 4(b). We disagree. In a case involving a conviction of "an offense listed in Article 42A.054(a)," section 4(a) sets forth the language with which the court is to charge the jury at punishment. *See id.* § 4(a). In this case, appellant was charged with aggravated sexual assault under penal code section 22.021. *See* TEX. PENAL CODE ANN. § 22.021. Section 22.021 is an offense listed in Article 42A.054(a). *See* TEX. CODE CRIM. PROC. ANN. art. 42A.054(a)(9) (limitation on judge-ordered community supervision). Thus, the following section 4(a) charge applied at punishment in this case:

> The length of time for which a defendant is imprisoned may be reduced by the award of parole.
>
> Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, the defendant will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less. If the defendant is sentenced to a term of less than four years, the defendant must serve at least two years before the defendant is eligible for parole. Eligibility for parole does not guarantee that parole will be granted.
>
> It cannot accurately be predicted how the parole law might be applied to this defendant if sentenced to a term of imprisonment, because the application of that law will depend on decisions made by parole authorities.
>
> You may consider the existence of the parole law. You are not to consider the manner in which the parole law may be applied to this particular defendant.

TEX. CODE CRIM. PROC. ANN. art 37.07 § 4(a).

The punishment charge submitted to the jury in this case stated the following:

Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time[5] to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

*It is also possible that* the length of time for which the defendant will be imprisoned might be reduced by the award of parole.

Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less, without consideration of any good conduct time he may earn. Eligibility for parole does not guarantee that parole will be granted.

It cannot be accurately predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made· by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

---

[5] The State acknowledges that the trial court's instruction in the punishment charge as to good conduct time was error, notwithstanding that appellant did not raise this as a point of error. We acknowledge but need not address that this Court has previously determined that a charge that contains language the legislature removed by amendment from article 37.07 in 2019 constitutes error. *Taylor v. State*, No. 05-20-00017-CR, 2022 WL 17335689, at *12 (Tex. App.—Dallas Nov. 30, 2022, pet. ref'd) (mem. op., not designated for publication). To the extent appellant's brief may be viewed as raising this issue, we would review that error for egregious harm. *Id.* Accordingly, because appellant did not object to this error, he is entitled to a reversal only if he suffered egregious harm as a result of the error. Our analysis of the issue raised as to parole applies equally to any purported error relative to good conduct time.

(Emphasis added). Appellant argues that "Injecting 'It is possible' under the circumstances imposed upon the jury that it had the obligation to apply parole law to [appellant] when considering punishment, not just the fact that the length of time may be reduced by such an award." In support of this argument, appellant cites a note sent out by the jury during deliberations at punishment. The note asked, "What is the difference between LIFE and 99 years? Does one not have the possibility of parole?" To this, the trial court responded, "The Court instructs you that you have all the law and the evidence. Please continue your deliberations."

As further support for his argument that there is no "doubt about the jury having considered parole," appellant cites the following argument made by his counsel at punishment:

> But, what is the proper sentence? Is the proper sentence probation? I don't think so. I'm not going to stand up here and tell you that I think probation is the proper sentence, because I don't think it is. Is the proper sentence ten years? Is a proper sentence 20 years? All I know is, any sentence you give him, his file will never even be dusted off and looked at for parole until half the time is considered. Think about that.

> So, at 36 years old, if you were to give him a ten-year or 15-year sentence, he wouldn't even be eligible for parole until five or seven and-a-half years. At 36, if you were to give him a 20-year sentence: Ten years. His family is going to stand by him, regardless. But think about his family, think about his kids, think about everything you heard, not just one side of what you heard, when assessing the proper punishment.

Appellant complains that this argument "insured in the minds of the jurors at least, that [appellant] would not be out in 'five or seven and a half years' if given life,"

–25–

and the jury's sentencing appellant "to life via consideration of the manner parole applies" violated appellant's rights to due process and equal protection.

The jury is presumed to have understood and followed the court's charge, absent evidence to the contrary. *Crenshaw v. State*, 378 S.W.3d 460, 467 (Tex. Crim. App. 2012). The charge at punishment specifically instructed the jury that it was "not to consider the manner in which the parole law may be applied" to appellant. We presume the jury followed the charge and did not consider the manner in which parole law might be applied to him. *See id.*

Appellant complains of the "erroneous instruction" that he would not become eligible for parole until the actual time served equaled one-half of the sentence imposed or 30 years, whichever was less. Appellant argues that "our legislatures intended ¼ of the sentence imposed or 15 years, whichever is less." In support of this argument, appellant cites article 37.07 section 4(b), which we have already determined is inapplicable. Therefore, we do not further address this argument.

### 3. Application of *Almanza* Factors

First, we consider the entire charge to the jury in the punishment phase of the trial. The charge correctly instructed the jury on the matters to be considered in deliberations, the burden of proof, and the requirement of unanimity. Further, absent evidence that the jury was actually confused by the charge, we presume the jury followed the trial court's instruction that it was "not to consider the manner in which the parole law may be applied to this particular defendant." *See Crenshaw*, 378

–26–

S.W.3d at 467. There is no evidence of jury confusion. The jury sent a note inquiring about the difference between a life sentence and a sentence of 99 years and whether one of those sentences would not include the possibility of parole. However, the jury was permitted to "consider the existence of the parole law," and nothing in the note indicated that the jury was engaging in a consideration of the manner in which parole law would be applied to appellant.[6] The charge correctly instructed the jury regarding the range of punishment. The jury, the sole factfinder, heard all the evidence, testimonial and documentary, weighed the credibility of the witnesses, and assessed appellant's punishment at the maximum sentence—imprisonment for life. We conclude the first factor does not weigh in favor of or against finding egregious harm.

Second, we consider the state of the evidence. Under this factor, we determine whether the evidence made it more or less likely that the charge error caused appellant actual harm. *Taylor*, 2022 WL 17335689, at *13. We must determine the likelihood that the jury would in fact have reached a non-unanimous verdict on the facts of this particular case. *Id.* The evidence included Holmes' detailed testimony of appellant's sexual assault of Holmes and appellant's testimony characterizing the encounter as consensual. Although appellant denied having a gun during the sexual assault, a gun containing appellant's and Holmes' DNA on the trigger was recovered

---

[6] Although the charge contained language about good conduct time that was no longer required under article 37.07, it also instructed the jurors that they were "not to consider the manner in which good conduct time may be awarded to or forfeited by this particular defendant."

near the place where appellant was arrested. The evidence at the punishment phase included DNA evidence linking appellant to other sexual assaults. Appellant's counsel stated appellant's "file will never even be dusted off and looked at for parole until half the time is considered," but this statement was consistent with the language in the charge that appellant would not become eligible for parole until "the actual time served equals one-half of the sentence imposed or 30 years, whichever is less."[7] We conclude the detailed and extensive state of the evidence, with the jury as the sole factfinder to weigh the evidence and determine the credibility of the witnesses, made it less likely that the jury charge caused appellant actual harm. Consequently, this factor weighs against finding egregious harm.

Third, we consider whether any arguments made by the State, appellant, or the trial court exacerbated or ameliorated the error in the charge. *Id.* And that language instructed the jury not to consider how parole law might be applied to appellant. Again, appellant's counsel did mention parole during the punishment-phase closing argument, but counsel's statements were consistent with the court's charge.[8] We conclude this factor weighs against finding egregious harm.

Finally, we consider any other relevant information, such as whether the jury sent requests for clarification during deliberations. *Id.*[9] The jury note specifically

---

[7] No evidence was offered regarding good conduct time.

[8] There was no mention of good conduct time by the State, appellant, or the trial court except in the charge language quoted earlier in this opinion.

[9] The record reveals that the jury did not seek any clarification regarding good conduct time.

–28–

inquired as to "What is the difference between LIFE and 99 years? Does one not have the possibility of parole? Again, the jury was permitted to "consider the existence of the parole law," and nothing in the note indicated that the jury was engaging in a consideration of the manner in which parole law would be applied to appellant. Rather, we may discern from the note that the jury was considering imposing a very high sentence, which it did within the range of punishment. While defense mentioned parole, the State in closing did not. We conclude the final factor weighs against finding egregious harm.

After considering and weighing all of the relevant factors, we conclude that the erroneous instructions regarding parole did not cause egregious harm to appellant. *See Gonzalez v. State*, 610 S.W.3d at 27. Nor did the erroneous jury instructions affect the very basis of the case, deprive appellant of a valuable right, or vitally affect a defensive theory. *See id.*

### 4. Jury Charge certification

In addition, appellant argues that the trial judge failed to certify the jury charge pursuant to article 36.17 of the code of criminal procedure. Without specifying whether he is referring to the jury charge at guilt/innocence or punishment, appellant complains that "a certified copy of the jury charge" shows it was filed on November 5, 2021, but the trial at which the jury deliberated was held on November 1, 2021. Appellant asserts there is "much irregularity" in this case with respect to the jury charge: the charge is not signed by the foreman, the judge's signature is "not

–29–

connected to the charge," the charge was not filed among the papers before being given to the jury, and the record does not show "what actual terms were read to the jury and we know not."

Article 36.17 provides that the general charge given by the court and all special charges given or refused shall be certified by the judge and filed among the papers in the cause. TEX. CODE CRIM. PROC. ANN. art. 36.17. Whenever it appears that any requirement of article 36.17 has been disregarded, the judgment shall not be reversed unless the error appearing from the record was calculated to injure the rights of defendant, or unless it appears from the record that the defendant has not had a fair and impartial trial. TEX. CODE CRIM. PROC. ANN. art. 36.19. Unless the matter was disputed in the trial court, or unless the record affirmatively shows the contrary, the court of appeals must presume that the court's charge was certified by the trial court and filed by the clerk before it was read to the jury. TEX. R. APP. P. 44.2. If the defendant does not object to a charging error during trial, the defendant must show actual egregious harm depriving him of a fair and impartial trial to obtain reversal of the conviction. *Haywood v. State*, No. 05-99-01806-CR, 2000 WL 1808430, at *1 (Tex. App.—Dallas Dec. 11, 2000, no pet.) (citing *Patrick v. State*, 906 S.W.2d 481, 492 (Tex. Crim. App. 1995)).

The record reflects that, after the State and the defense closed at the guilt/innocence phase, the trial court read the court's charge to the jury:

> THE COURT: Thank you. Please, be seated. Thank you for your patience, Ladies and Gentlemen. The Court has had some paperwork prepared for you. That's now been done. Both sides having rested and closed, it is now the obligation of the Court to read to you the Jury Charge in this case, a copy of which has been provided to each of you to read along with the Court. The Charge in this case reads as follows: (Reading) "State of Texas versus Dralon Patterson, Charge of the Court . . . ." (*Charge(s) of the Court read aloud to the Members of the Jury.*).

(Emphasis in original).

After the State and the defense closed at the punishment phase, the trial court

read the punishment charge to the jury as follows:

> THE COURT: All right. Both sides having rested and closed, Members of the Jury, it's now the Court's obligation to read to you the Court's Charge regarding sentencing in this case, a copy of which is being provided to each of you to read along with the Court. The Charge in this case reads as follows: Members of the Jury . . . (*Charge(s) of the Court read aloud to the Members of the Jury.*)

(Emphasis in original).

The record contains the written jury charge from both the guilt/innocence and

punishment phases. Both charges have the word "original" handwritten on the first

page, both are signed by the trial judge, and both of the verdict forms attached to the

charges are signed by the presiding juror. With no evidence to the contrary in the

record, it appears the charge was read to the jury, the judge certified the charge, and

only the original version of the charge was read and submitted to the jury. At most,

it appears the charges were not date stamped until after the verdicts were returned

by the jury. Nevertheless, based on this record, appellant has failed to show actual

egregious harm depriving him of a fair and impartial trial to obtain reversal of the

–31–

conviction. *See Patrick v. State*, 906 S.W.2d at 492; *Haywood*, 2000 WL 1808430, at *1. We overrule appellant's first issue.

## B.  Issue 2:  Voir Dire Challenge

Although appellant lists among his enumerated issues a second issue asserting that his right to an impartial jury was taken away by prosecutors striking every black person from the venire panel, appellant entirely fails to address this issue outside the context of his ineffective assistance of counsel claim.  In short, appellant's brief contains no stand-alone discussion whatsoever of his "second issue."  Because appellant had failed to provide a clear and concise argument for this issue with appropriate citations to authorities and the record, we conclude he has waived this issue as an independent ground on appeal. *See* TEX. R. APP. P. 38.1(i).  To the extent this issue informs appellant's challenges to his ineffective assistance of counsel claims, we will consider this issue in that context alone.  We do not further address appellant's second issue.

## C.  Issue 3:  Ineffective Assistance of Counsel[10]

In his third issue, appellant asserts he received ineffective assistance of counsel.  To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's performance was deficient and (2) a reasonable probability

---

[10] While it is rare that the trial record on direct appeal will contain sufficient information to permit a reviewing court to fairly evaluate the merits of such a serious allegation against trial counsel, *Thompson v State*, 9 S.W.3d 808, 813-14 (Tex. Crim. App. 1999), in this case the record was developed during the hearing on appellant's motion for new trial.

exists that, but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984); *State v. Morales*, 253 S.W.3d 686, 696 (Tex. Crim. App. 2008). The defendant bears the burden of proving both Strickland prongs by a preponderance of the evidence. *Thompson*, 9 S.W.3d at 813.

The right to effective assistance of counsel does not entitle a defendant to errorless or perfect counsel, and a sound trial strategy may be imperfectly executed. *See Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006). Counsel's performance is deficient if it falls below an objective standard of reasonableness. *Johnson v. State*, 624 S.W.3d 579, 585 (Tex. Crim. App. 2021) (citing *Strickland*, 466 U.S. at 688). It is not sufficient that the appellant show, with the benefit of hindsight, that his counsel's actions or omissions during trial were merely of questionable competence. *See id.*

### 1. Evidentiary challenges and objections:  Argument IV and V

Outside of his issue of ineffective assistance of counsel, including basic objections and evidentiary challenges, appellant in his argument identifies two unenumerated issues regarding the admission of evidence: 1) the admission of extraneous offense evidence inadmissible under rule of evidence 403 and 2) the improper admission of business records.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Colone v. State*, 573 S.W.3d 249, 264–65 (Tex. Crim. App. 2019). A

–33–

trial court does not abuse its discretion if the decision to admit evidence is within the zone of reasonable disagreement. *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018). If the trial court's ruling on admissibility is correct under any applicable theory of law, the trial court's decision should not be disturbed, even if the trial court gives the wrong reason for its ruling. *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016).

### a. Rule 403

Appellant complains that the trial court admitted during the punishment phase medical records of two sexual assault victims in cases where appellant's DNA was present. Appellant concedes he "did not specifically say 'Rule 403' objection" but cites his argument at trial that the evidence was "highly prejudicial" and asserts the trial court "conducted a balancing test to determine if the evidence should be excluded due to its probative value being substantially outweighed by the danger of unfair prejudice." The record shows the State responded to appellant's objections by arguing that the evidence was "highly probative," regardless of whether it was also prejudicial. We note that, at trial, appellant also argued his inability to question the victims of the two extraneous sexual assaults was "severely hampering" his defense, and he had a constitutional right to "question these victims."

Rule 403 provides:

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:

> unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence.

TEX. R. EVID. 403. Rule 403 creates a presumption that relevant evidence will be more probative than prejudicial. *Hernandez v. State*, 390 S.W.3d 310, 323 (Tex.Crim.App.2012). All evidence is prejudicial to one party or the other; thus, it is only when there is a clear disparity between the degree of prejudice and the probative value that rule 403 is applicable. *Id.* at 324.

When a party objects to evidence under rule 403, a trial court must perform a balancing test to determine if the evidence's probative value is substantially outweighed by its prejudicial effect. *See* TEX. R. EVID. 403. In conducting a rule 403 analysis, a trial court must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App 2006) (identifying factors to be balanced under rule 403 but recognizing "these factors may well blend together in practice"); *see also Hernandez*, 390 S.W.3d at 324. We should reverse the trial court's balancing

determination "rarely and only after a clear abuse of discretion." *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999).

Regarding the first two *Gigliobianco* factors, we conclude that the evidence's inherent probative force was strong. Appellant's theory was that the encounter with Holmes was consensual; therefore, evidence linking appellant's DNA to two prior sexual assaults was highly relevant to the jury's assessment of appellant's punishment.

As to the third factor, nothing in the record indicates that admitting this evidence would be so inherently inflammatory that it would tend to elicit an emotional response and impress a jury in some "irrational and indelible way." *See Old Chief v. United States*, 519 U.S. 172, 180 (1997).

Regarding the fourth and sixth factors, we have already concluded that the evidence was probative of a consequential fact—appellant's link to two additional sexual assaults. Because of the evidence's probative and straightforward nature, it likely would not confuse or distract the jury. Although the State spent a considerable amount of time during the punishment phase developing the evidence of appellant's link to the two additional sexual assaults, the time spent was not inordinate considering the evidence's probative value.

Finally, as to the fifth factor, the danger of a jury giving the evidence undue weight by a jury ill equipped to assess it, the disputed evidence here was not prone to this tendency, as it pertained to matters that a jury could easily understand.

For the above reasons, the rule 403 factors weigh in favor of admitting the evidence. Thus, we do not conclude the trial court abused its discretion by determining the probative value of the evidence was not substantially outweighed by any risk of unfair prejudice in admitting the evidence. *See De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009). Appellant's arguments pursuant to rule 403 lack merit.

### b. Admission of Business Records

Appellant next complains of the admission of State's Exhibit 42, the medical record Kelley prepared in connection with Holmes' February 1, 2019 sexual assault examination. In his brief, appellant states that he "argued in his motion for new trial that the alleged business records affidavit of Dallas County Hospital District did not satisfy Tex. R. Evid. 803(6) and 902(10) notice provision and should not have been admitted." The record shows that appellant did not object to the admission of Exhibit 42 at trial. To preserve error, an appellant must make a *timely* request, objection, or motion. TEX. R. APP. P. 33.1(a)(1). A defendant may not raise a matter for the first time in a motion for new trial if he had the opportunity to raise it at trial. *Colone*, 573 S.W.3d at 260. Because appellant had the opportunity to object to the admission of Exhibit 42 when it was admitted at trial and failed to do so, his objections to the exhibit were not timely raised in a motion for new trial. *See id.* Accordingly, we do not further address this issue.

### 2. Jury Selection

Appellant complains that, out of "14 potential black jurors, none made the cut," and his counsel was ineffective in "allow[ing] this to go on without so much as a shuffle, *Batson*[11] *Challenge*, or any other viable objection." Appellant asserts the State's "peremptory challenges were based on race" and alleges the State engaged in "shenanigans," but appellant's claim boils down to a claim that no black jurors "made the cut" and, therefore, the State must have exercised its peremptory challenges in a way that was discriminatory based on race.[12]

In *Batson*, the Supreme Court outlined an analytical tool for testing the challenges to the State's use of peremptory strikes: initially, the defendant must establish a prima facie showing that the State exercised its peremptory challenges on a basis of race. *Batson*, 476 U.S. at 106; *Staley v. State*, 887 S.W.2d 885, 890 (Tex. Crim. App. 1994). The burden then shifts to the State to articulate race-neutral explanations for its questioned strikes; the defendant may rebut these explanations. *Batson*, 476 U.S. at 106; *Staley*, 887 S.W.2d at 890. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful racial discrimination by the State. *Batson*, 476 U.S. at 106; *Staley*, 887 S.W.2d at 890. In *Staley*, "the *prima facie* showing at the trial court was *only* that the State struck a member of an identifiable racial group." *Staley*, 887 S.W.2d at 890 (emphasis in original). The court determined that such a showing was "not sufficient to meet a

---

[11] *Batson v. Kentucky*, 476 U.S. 79, 106 (1986).

[12] The record is devoid of any demographic evidence of the venire panel.

defendant's prima facie burden for purposes of *Batson*." *Id.* (citing *United States v. Lewis*, 892 F.2d 735, 736 (8th Cir.1989) ("While it is true that striking a black venireperson for racial reasons is always violative of the constitution, it is not true that all peremptory strikes of black venirepersons are for racial reasons.")).

Here, as in *Staley*, the evidence that no black jurors "made the cut" was not sufficient to meet the prima facie burden for purposes of *Batson*. *See id.* Under these circumstances, we conclude appellant has not met his burden of proving both *Strickland* prongs by a preponderance of the evidence as to his complaint about jury selection. *See Thompson*, 9 S.W.3d at 813.

### c.      Pretrial Hearings, Investigate and Conduct Pretrial Discovery

Appellant next argues that his counsel was ineffective in failing to conduct a hearing pursuant to rule of evidence 702 to determine the qualifications of the sexual assault nurses who testified at trial.

Rule of evidence 702 provides that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. TEX. R. EVID. 702. At the hearing on appellant's motion for new trial, both of appellant's attorneys testified that their theory of the case was that appellant's contact with Holmes was consensual, and the qualifications of the SANE nurses were not an issue. Both attorneys testified that this theory was based on statements

made by appellant himself. We conclude appellant has not met his burden of proving both *Strickland* prongs by a preponderance of the evidence as to his complaint about the lack of a 702 hearing. *See Thompson*, 9 S.W.3d at 813.

### d. Lack of Expert Report

Appellant next contends that his counsel was ineffective for failing to hire an expert to "evaluate the DNA testing that was put before the court." Appellant's argument also incorporates a claim that counsel should also have challenges the chain of custody of the DNA evidence. Again, one of appellant's attorneys testified at the hearing on appellant's motion for new trial that he did not hire a DNA expert because "it wasn't necessary for the theory of the case." As discussed previously, the defensive theory was consent, and appellant has not met his burden of proving both *Strickland* prongs by a preponderance of the evidence as to his complaint about the lack of a DNA expert or a challenge to the chain of custody of the DNA evidence. *See Id.*

### e. Lack of Objection to Testimony Regarding Touch DNA

Appellant asserts that his counsel was ineffective for failing to object to Ferreira's testimony concerning touch DNA, specifically her testimony that DNA could have been transferred to the trigger of the gun after appellant touched his penis that had been inside Holmes' vagina and then touched the trigger of the gun. Appellant argues it cannot be "possible" that DNA was transferred to the trigger of the gun because crime scene analyst Rebecca Kerr testified she did not find any

fingerprints on the gun when she tested it.  Similarly, appellant argues that LaTanya Waites, who testified concerning latent fingerprints recovered from Holmes' vehicle, was not a qualified expert and was not qualified to lift fingerprints. Therefore, appellant concludes, Ferreira's testimony about touch DNA, finger prints, finger print cards, transfer trigger DNA, and the four swabs taken from the gun and tested for DNA should not have been admitted.  We disagree with appellant's reasoning and reject his contention that the absence of fingerprints on the gun made it impossible for there to have been DNA transferred to the gun.  Ferreira testified that, anytime a person touches an item, "you are leaving a DNA profile behind," and "[i]t's whether or not it's detectable."  Ferreira was not asked and therefore did not testify whether a recoverable fingerprint was necessary in order to recover DNA. Rather, Ferreira testified:

> Q. Can you please explain to the jury what "transfer DNA" is.
> A. Anytime you touch an item, you are leaving a DNA profile behind. It's whether or not it's detectable. We slough our skin cells off. So anytime you touch something, you're leaving your DNA.
> Q. So you're aware this is a sexual assault case; is that correct?
> A. Yes.
> Q. Is it reasonable or possible that if there was sexual contact with a female and the Defendant's organ, and the Defendant touched his penis that was just previously in the complainant's vagina and then touched the trigger of that gun, is it possible that that is how the complainant's DNA was also found on the trigger?
> A.     Yes, that would be possible.

Appellant presents no authority or legal argument for the requirement of both DNA and fingerprint on the same piece of tangible evidence.  The jury was presented with

evidence that appellant transferred Holmes' and his own DNA to the trigger of the gun and the absence of evidence relative to a recoverable fingerprint. Again, appellant has not met his burden of proving both *Strickland* prongs by a preponderance of the evidence as to his complaints about the lack of an objection to touch DNA testimony and Waites' qualifications. *See Id.*

### f. Commitment Question

Appellant next complains that the prosecutor was permitted to ask the jury a commitment question during voir dire. Because this issue is cast as a claim of ineffective assistance, we interpret this issue as an assertion that counsel was ineffective in failing to object to the question appellant characterizes as a commitment question. Commitment questions are those that commit a prospective juror to resolve, or to refrain from resolving, an issue a certain way after learning a particular fact. *Standefer v. State*, 59 S.W.3d 177, 179 (Tex. Crim. App. 2001). During voir dire, the prosecutor asked the veniremembers the following question:

> So, what I want to talk about is, you know, who here – and some people just have a principle against life in prison. They just – I have a – I can't do it. I don't care what the house says. I don't care. I cannot do life in prison. And I respect that. But I need to know it now, if anyone holds that opinion.
>
> Does anyone in the first row hold the opinion that you cannot give life in prison? Life is just – L-I-F-E, that's too long?

At the motion for new trial hearing, one of appellant's attorneys testified he did not object to the question because he did not feel the question was improper, and objecting would have hurt appellant. We agree that the prosecutor's question was

not an improper commitment question. The question inquired into whether any members of the venire held a particular opinion and did not ask them to resolve, or to refrain from resolving, an issue a certain way after learning a particular fact. *See id.* Appellant has not met his burden of proving both *Strickland* prongs by a preponderance of the evidence as to his complaint about the prosecutor's purported commitment question. *See Thompson*, 9 S.W.3d at 813.

### g. Penile Swab

Appellant next complains that his counsel was ineffective for failing to "investigate" a penile swab taken from appellant where "'identity' was an issue at trial. The record shows there was a penile swab taken from appellant, but the swab was never tested because it was taken without a warrant. Appellant argues identity was an issue because of discrepancies between what appellant testified Holmes was wearing and what photographs taken on the night of the offense show she was wearing. Appellant goes on to complain that "[t]here is nothing in the record to show Patterson's DNA was inside one woman less alone three." Appellant speculates that "the State was in possession of the penile swab and would have presented in evidence if confident it showed Patterson was inside the alleged victim." Further speculating that the penile swab would show that appellant "did not have a sexual encounter with the victim," appellant claims that "this alone should be sufficient to grant Patterson a new trial in the interest of justice."

Appellant's argument ignores the DNA evidence admitted at trial linking appellant's DNA to Holmes and two other sexual assault victims. Moreover, in arguing identity was an issue, appellant ignores his own testimony that his admitted sexual encounter with Holmes was consensual. In light of the actual state of the evidence at trial, we conclude appellant has not met his burden of proving both *Strickland* prongs by a preponderance of the evidence as to his complaint about the penile swab. *See id*.

### h. Failure to Investigate

Appellant next asserts that his counsel was ineffective for failing to "investigate that someone else committed the crime." Specifically, appellant complains that counsel failed to investigate witnesses in the garage where the sexual assault occurred who "weren't sure" and thought a man they saw in the garage was white even though appellant is black.

A criminal defense attorney has a duty to make an independent investigation of the facts of a case and to seek out and interview potential witnesses. *Toledo v. State*, 519 S.W.3d 273, 287 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd). In defining this obligation, the United States Supreme Court has stated that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. At the motion for new trial hearing, one of appellant's trial attorneys testified he thought it was reasonable not to call the parking garage witnesses [w]hen [his] client admitted

to having a sexual encounter with that same complainant." We agree that counsel's decision not to call these witnesses was reasonable given appellant's testimony that his sexual encounter with Holmes was consensual. *See id.* Appellant has not met his burden of proving both *Strickland* prongs by a preponderance of the evidence as to his complaint about the penile swab. *See Thompson*, 9 S.W.3d at 813.

### i. Deadly Weapon

Appellant next argues that his counsel was ineffective for failing to object to a deadly weapon special issue being "improperly submitted to the jury." As the State points out, the indictment in this case did not include an allegation of a deadly weapon, and the State did not seek a special finding regarding a deadly weapon. Holmes testified that appellant threatened her with a gun during the sexual assault, but the indictment elevated the offense to aggravated sexual assault not by the use of a deadly weapon but by the allegations that appellant, by acts or words, placed Holmes in fear that death, serious bodily injury, or kidnapping would be imminently inflicted on any person or that appellant threatened to cause the death, serious bodily injury, or kidnapping of any person. Because there was no deadly weapon at issue in this case, appellant has not met his burden of proving both *Strickland* prongs by a preponderance of the evidence as to his complaint about counsel's failure to object to a deadly weapon issue. *See id.*

### j. Defensive Theory

Appellant next contends that his counsel was ineffective in relying on the theory that appellant's sexual encounter with Holmes was consensual. Decisions as to the defensive theory of a case should be left to the defendant and his lawyer. *Posey v. State*, 966 S.W.2d 57, 63 (Tex. Crim. App. 1998); *see Ex parte Nailor*, 105 S.W.3d 272, 277 (Tex. App.—Houston [14th Dist.] 2003), *aff'd*, 149 S.W.3d 125 (Tex. Crim. App. 2004) (trial counsel not ineffective in relying on theory of self defense not raised by evidence but which counsel believed was raised by appellant's version of the events). The record shows the defensive theory of consent was based on appellant's version of events. At the motion for new trial hearing, one of appellant's attorneys testified that his attorneys "tried repeatedly" to get appellant to plead guilty and take "the deal that was offered to him," 30 years' confinement, but appellant "refused." Appellant's attorneys "explained to [appellant] in preparation, if you are going to go consensual, there's no chance to win this case unless you testify to how this was consensual." Appellant's attorneys did a mock cross-examination of "what [appellant's] testimony was going to be, and it did not go well." Appellant did not "seem believable," and his attorneys told him they did not know "if the jury will like what he's saying." Nevertheless, appellant persisted in his desire to testify that the encounter with Holmes was consensual. *See Posey*, 966 S.W.2d at 63. We conclude appellant has not met his burden of proving both *Strickland* prongs by a preponderance of the evidence as to his complaint about the defensive theory in this case. *See Thompson*, 9 S.W.3d at 813.

–46–

### k. Mistrial

Appellant next contends that counsel was ineffective in failing to request a mistrial in response to the prosecutor's closing argument at guilt/innocence. Specifically, appellant complains of the following argument:

> I also want to talk about the Fifth Amendment. I know Mr. Penfield spoke to you about that. He said, if the Defendant doesn't testify, you're not allowed, by law, to consider that in your deliberations. Once the Defendant decides to testify, all that's out of the window. Then it becomes your primary job to determine his truthfulness, why he might be lying. You know, what are indications of lying? In fact that's your job with every witness, right, to judge the credibility and the evidence of the testimony?

> So, in this case, you've gotten the opportunity to hear both from the accuser and the accused. It's your job to determine who's credible. What did we hear, that made sense? Who seemed credible to me? That's what you have to decide. I contend that you've got the accuser in this case, the victim in this case, Ms. Holmes, who has been absolutely truthful throughout.

As a general rule, when a defendant voluntarily takes the stand before the jury, he is subject to the same rules as any other witness in that he may be impeached, contradicted and cross-examined as to new matters. *Sanchez v. State*, 707 S.W.2d 575, 577 (Tex. Crim. App. 1986). Appellant's contention insinuates that the prosecutor's complained-of argument was "a comment on the defendant's failure to testify." On the contrary, appellant in this case testified, subjecting him to the same rules as any other witness. *See id.* We conclude appellant has not met his burden of proving both *Strickland* prongs by a preponderance of the evidence as to his

complaint about counsel's failure to seek a mistrial. *See Thompson*, 9 S.W.3d at 813.

### l.      Cross-Examination of Holmes

Finally, appellant asserts counsel was ineffective for not cross-examining Holmes. Cross-examination is inherently risky, and a decision not to cross-examine a witness is often the result of wisdom acquired by experience in the combat of trial. *Ex parte McFarland*, 163 S.W.3d 743, 756 (Tex. Crim. App. 2005). It is frequently a sound trial strategy not to attack a sympathetic eyewitness without very strong impeachment. *Id.* Otherwise, an attorney risks reinforcing the eyewitness' previous identification of the defendant as the assailant. *Id.* "If ineffective, cross-examination can serve to bolster the credibility of the witness and underscore the very points that are sought to be impeached. Thus, unless there is a good basis on which to cross-examine . . . it can be more effective to refrain from cross-examining a damaging witness to minimize the impact of his testimony." *Id.* n.40 (quoting *Dannhaus v. State*, 928 S.W.2d 81, 88 (Tex. App.—Houston [14th Dist.]1996, pet. ref'd).

Here, Holmes presented detailed, comprehensive testimony recounting appellant's sexual assault of her. Trial counsel reserved questioning for defense's case-in-chief. Appellant testified in his case in chief and related his version of the events. In light of her testimony, we conclude it was sound trial strategy not to attack this sympathetic witness. *See Ex Parte McFarland*, 163 S.W.3d at 756. Appellant has not met his burden of proving both *Strickland* prongs by a preponderance of the

–48–

evidence as to his complaint about counsel's decision not to cross-examine Holmes. *See Thompson*, 9 S.W.3d at 813. We overrule appellant's third issue.

## State's Cross Point

In a single cross-point, the State asks that the judgment be modified to reflect that appellant is required to register as a sex offender.

Article 42.01 of the Texas Code of Criminal Procedure requires that the judgment contain, among other things, "In the event of conviction of an offense for which registration as a sex offender is required under Chapter 62, a statement that the registration requirement of that chapter applies to the defendant and a statement of the age of the victim of the offense[.]" TEX. CODE CRIM. PROC. ANN. art. 42.01 § 1A(27). The statement of the age of the victim applies only if the victim or intended victim was younger than fourteen years of age at the time of the offense. *See id.* art. 42.015(b). Aggravated sexual assault is an offense for which sex offender registration is required under Chapter 62. *See* TEX. PENAL CODE ANN. § 22.021; TEX. CODE CRIM. PROC. ANN. arts. 62.001(5)(A), 62.002.

This Court has the power to correct and reform the judgment of the court below to make the record speak the truth when it has the necessary data and information to do so, or make any appropriate order as the law and the nature of the case may require. *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd). Accordingly, we modify the judgment to reflect that appellant is required to register as a sex offender. We sustain the State's cross-point.

As modified, we affirm the trial court's judgment.

/Bonnie Lee Goldstein/
BONNIE LEE GOLDSTEIN
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
211024F.U05



# Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

DRALON DURAN PATTERSON,
Appellant

No. 05-21-01024-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 5, Dallas County, Texas Trial Court Cause No. F-1975183-L. Opinion delivered by Justice Goldstein. Justices Carlyle and Kennedy participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

the box is checked next to the line "Defendant is required to register as sex offender in accordance with Chapter 62, CCP."

As **REFORMED**, the judgment is **AFFIRMED**.

Judgment entered February 29, 2024